UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAFARI CHILDCARE INC; JAMES OURTH, | ) |
| | ) |
|    Plaintiffs, | ) Case No.: 17 C 8547 |
| | ) |
|            vs. | ) Judge: |
| | ) Magistrate Judge: |
| SHIRLEY PENNY; DENICE MURRAY; | ) |
| CAROL MORRIS; RICHARD ALEXANDER; | ) |
| JOEL LAMZ; STANY D'ZOUSA; EDIE | ) |
| WASHINGTON GURLEY; JOSE ALEX | ) |
| MEDINA; FRANK NEUMAN; HELEN CROSS; | ) |
| BETH GIRARDIER; MARY LIVORSI; | ) |
| LESLIE PARELLO-HORTON, JODI | ) |
| GOLEMBIEWSKI; JODINE WILLIAMS; | ) JURY DEMAND |
| EVA CAMACHO; ROBERT MUSIAL; | ) |
| CONNIE NEYLON; DONNA RIEDL; | ) |
| GWENDOLYN AMBER; VERONICA RESA; | ) |
| COURTNEY MARSHALL; and STACY SMITH, | ) |
| | ) |
|    Defendants. | ) |

**COMPLAINT**

    1.     This is an action for money damages brought pursuant to 42 U.S.C. § 1983.

    2.     Jurisdiction for Plaintiffs' claims is based on 28 U.S.C. §§ 1331 and 1343(a).

    3.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), in that the claims arose in this district as alleged below.

**Parties**

    4.     Plaintiff Safari Childcare Inc., (Safari) is an Illinois Corporation consisting of multiple child daycare facilities in the Chicago, Illinois suburbs.

    5.     Plaintiff James Ourth is the owner and operator of Safari. Mr. Ourth is a resident of the State of Illinois and has been in the business of owning and operating successful daycare facilities in Illinois since 1991.

1

6. Defendants Shirley Penny, Denice Murray, Carole Morris, Richard Alexander, Joel Lamz, Stany D'Zousa, Edie Washington Gurley, Jose Alex Medina, Frank Neuman, Helen Cross, Beth Girardier, Mary Livorsi, Leslie Parello-Horton, Jodi Golembiewski, Jodine Williams, Eva Camacho, Robert Musial, Connie Neylon, Donna Riedl, Gwendolyn Amber, Veronica Resa, Courtney Marshall, and Stacey Smith are duly appointed Illinois Department of Children and Family Services employees. At all times relevant to this Complaint, the Defendants were acting in the course and scope of their employment, and under color of state law, ordinance and/or regulation.

7. The Defendants are sued in their individual capacities.

**Facts**

8. James Ourth is the owner and operator of Safari Childcare Inc. Mr. Ourth has been in the business of owning and operating successful daycare facilities in Illinois for over 25 years. Mr. Ourth first opened his daycare business in 1991, when he was twenty-four years old. The business grew and expanded over the last 25 years as Mr. Ourth's experience and drive was repeatedly recognized by customers and peers.

9. In 2006, Mr. Ourth's daycare business was re-named to Safari Childcare Inc.

10. From 2006 to 2014 Safari operated multiple daycare centers in the Chicago suburbs, including: Mount Prospect, Palatine, Cary, Bensenville, Streamwood, McHenry, Highland Park, East Dundee, Hanover Park, and Belvidere, cities in the state of Illinois.

11. Employees of the Department of Children and Family Services (DCFS), the organization charged with overseeing the licensing of daycare centers in Illinois, inspected Safari's various facilities at their inception and authorized the necessary permits and licenses for Safari to open and operate at all locations.

12. Safari's daycare centers have always been clean, open, and inviting, and run by competent, caring, and experienced staff who are deeply committed to the safety and well-being of children.

13. Safari has always worked diligently to comply with the vigorous licensing and renewal requirements of State law and the Illinois Administrative Code (the Code), and to cooperate with DCFS announced and unannounced checks to Safari facilities.

14. Prior to 2010, Mr. Ourth and Safari did not experience any significant problems with DCFS regulation of Safari daycare centers.

15. In 2010, Safari began to experience problems with Defendants during facility checks and started to notice delays in licensing and amendment applications.

16. In the spring of 2010, Plaintiffs submitted initial licensing applications to Defendants in order to operate daycare centers in Streamwood, McHenry, and Highland Park,

2

Illinois. Plaintiffs simultaneously submitted an amendment application for one of the Mount Prospect locations on Algonquin Road to include night and weekend care.

17. Defendants refused to timely process and approve these applications, causing unexpected and unusual delays, which prohibited Safari from opening its operations or expanding as scheduled.

18. These intentional delays were caused by the Defendants, some of whom had been removed by police from Safari facilities just a few months prior for inappropriate conduct at the facility.

19. Safari made several efforts to contact DCFS Executives to request that the applications be processed timely. Defendants continued to delay in processing and approving the permit applications for Streamwood, McHenry and Highland Park centers, and also refused to amend the license for the Mt. Prospect-Algonquin Road location to include nights and weekends.

20. Throughout 2011 and early 2012, James Ourth continued to attempt to resolve the problems directly with DCFS directors and administrators by scheduling numerous meetings.

21. When DCFS administrators were not supportive, Mr. Ourth began contacting his local political representatives, including numerous Illinois Senators and Representatives, to assist him in the issues he was having with Defendants. A number of important politicians agreed to support Safari in resolving the issues they were having with Defendants and even participated in multiple meetings with Defendants and DCFS directors and administrators.

22. Following a notable April 2012 meeting in which Mr. Ourth and multiple political representatives confronted DCFS administrators about their mishandling of daycare licensing and regulation, Defendants began a course of conduct geared toward shutting down Safari daycare facilities, in retaliation for Safari's conduct in communicating and meeting with Illinois politicians about inadequacies and failings of DCFS and the Defendants.

23. Defendants began working together to systematically target Safari, and single them out, by applying DCFS daycare licensing and issuing/renewal/amendment policies and procedures in an unlawful, unfair, and unreasonable manner, and in a manner that they were not applying to other similarly situated daycares.

24. First, Defendants took steps to intentionally cause the delaying of permits, licensing, and renewal visits.

25. Then, Defendants began increasing the amount of unannounced checks on the facilities. During the course of these visits, Defendants would stretch their licensing power beyond any reasonable interpretation of the licensing statutes to find the most minuscule alleged technical violations, none of which would have been considered violations prior to this time period, and a significant majority of which were not supported by the licensing statute or administrative code.

3

26. During these visits, Defendants also deliberately and maliciously harassed, intimidated, and threatened Safari staff and customers, creating a hostile and unpleasant environment, in an ongoing effort to cause increased turnover of Safari employees and to tarnish Safari's reputation with its customers, staff and community.

27. During this time period Defendants maximized disruption to Safari's business by repeatedly violating Safari for alleged noncompliance with minuscule, vague provisions of the Code. At times, Defendants failed to even reference which provisions applied to these alleged violations or referenced provisions that were inapplicable. This was intentionally done to make it difficult for Safari to understand the nature of the alleged violation and to remedy it appropriately.

28. Defendants then repeatedly failed to offer appropriate corrective plans to Safari and returned for follow-up visits to check on the status of a correction prior to Safari even receiving the notification of the alleged violation from the previous visit.

29. Malicious, unachievable deadlines were set by Defendants to bolster their case for enforcement action, by making it seem that Safari was refusing to comply with DCFS requests, when in fact, Safari was complying or was reasonably unaware of how DCFS wanted them to correct/remedy the alleged violations.

30. Other meetings took place with DCFS Executives, Safari, and politicians, throughout 2012 and 2013, but none resulted in Defendants stopping their retaliatory conduct or singling out Safari. In fact, it only caused Defendants' treatment of Safari to worsen.

31. Even when Safari went above and beyond to "correct" the alleged violations, taking time and money away from running the business, Defendants repeatedly manufactured new violations, misrepresented the condition of Safari's daycare facilities, and sought to hold Safari to a significantly higher standard than what was required by law or Code, and to a higher standard than was being applied to other daycare centers.

32. These actions were taken intentionally by Defendants who acted individually and together, as part of a retaliatory scheme to harm Safari's business, to harm Safari's reputation, and ultimately in an effort to initiate enforcement action and revocation proceedings to shut down Safari daycare centers.

33. These willful and malicious actions by Defendants, resulted in Safari receiving numerous unlawful, unfair, and unsupported statutory and administrative violations, which put them in jeopardy of their licenses not being issued, amended, renewed and/or revoked, and ultimately culminated with the shutting down of multiple Safari locations.

34. From July 2013 to May 2015, Safari received five notices from DCFS of its intent to revoke/refuse to renew Safari's licenses for five daycare facilities, all within eighteen months of one another, all while other similarly situated daycares with the same or a significantly larger amount and more serious alleged violations remained open.

35. On November 1, 2013, DCFS served a notice of refusal to issue, amend, renew, and/or revoke Safari Childcare's license for the McHenry daycare, which resulted in the shutdown of that facility in May 2015.

36. On November 21, 2013, DCFS served a notice of refusal to issue, amend, renew, and/or revoke for Safari Childcare's license for the East Dundee daycare, which resulted in the shutdown of that facility in June 2016.

37. On July 7, 2014, DCFS served a notice of refusal to issue, amend, renew, and/or revoke Safari Childcare's license for the Mount Prospect-Algonquin Road daycare, which resulted in the shutdown of that facility in July 2017.

38. In December 2014, DCFS served a notice of a refusal to issue, amend, renew, and/or revoke Safari Childcare's license for the Streamwood daycare, which resulted in the shutdown of that facility in May 2017.

39. On May 22, 2015, DCFS served a notice of refusal to issue, amend, renew, and/or revoke Safari Childcare's license for the Cary daycare, which resulted in the facility shutdown and case dismal on December 29, 2015.

40. The basis for these refusals to issue, amend, renew, and/or revoke notices were based on the false and/or misrepresented violations brought by Defendants. And the basis for the ordered shutdowns was Defendants' false testimony in administrative court, where they participated in maliciously prosecuting Safari for Code violations.

41. The closure of five Safari daycare centers in a short period of time resulted in the termination of many employees, the displacement of hundreds of children, and the loss of substantial revenue to Safari.

42. Other similarly situated daycare centers were and are allowed to operate and renew/amend their licenses despite numerous violations, including violations that are vastly more serious than those ever alleged to have occurred at any Safari daycare center.

43. Based on publicly-available data provided by DCFS, enforcement actions to revoke or refuse to issue/renew/amend a daycare license to a facility like Safari are rare. Enforcement actions based on common minor technical violations are so unusual as to be almost unheard of. Safari was singled out and treated differently than other similarly situated daycare centers based on Defendants' personal animus towards Safari.

44. Defendants' actions were not motivated by any lawful government, administrative or regulatory purpose, but based on personal animus against Safari, Mr. Ourth, and its management and staff for speaking out publically against DCFS and its unjust practices and unlawful interference with Safari's business.

45. The closure of five Safari locations combined with the delays and financial costs associated with complying with Defendants' targeted, irrational and unlawful administrative enforcement actions, created a domino effect with regard to the other Safari locations, and ultimately resulted in the closure of: Highland Park (June 2015); Palatine (October 2016); Belvidere (January 2017); and Bensenville (April 2017).

46. Because of Defendants' ongoing, intentional and malicious conduct, a substantial number of children and families were displaced from their daycare centers of choice, many employees lost their jobs, others took significant pay reductions, property owners were left without commercial tenants, communities were left without sponsorships for community events, and Safari was effectively destroyed in less than two years.

47. Defendants' conduct is continuing in nature and ongoing since the problems began in 2011. Plaintiffs are concerned that without judicial declaratory action Defendants will continue to violate Safari's rights in relation to the two remaining daycare centers.

48. Each individual Defendant personally participated in the unlawful conduct described above and acted jointly and in concert with the other Defendants who participated or acquiesced or failed to intervene in the unlawful conduct.

49. As a direct and proximate result of the acts of the Defendants described above, Plaintiffs suffered damages including pecuniary damages, financial damages, reputational damages, and emotional distress.

## COUNT I
### (42 U.S.C. § 1983 – Equal Protection - Class of One)

50. Plaintiffs re-alleges paragraphs 1 through 49 as if fully set forth herein.

51. Defendants singled out Plaintiffs and subjected them to a pattern of harassment and unreasonable licensing citations and revocations. In doing so, they intentionally treated Plaintiffs differently than others similarly situated.

52. There was no rational basis for the difference in treatment.

53. The Defendants were motivated by illegitimate animus against the Plaintiffs.

WHEREFORE, Plaintiffs asks that this Honorable Court:

a) Enter judgment against the individual Defendants;
b) grant Plaintiffs a declaration that the conduct of Defendants is in violation of their constitutional rights and enter a preliminary and then permanent injunction prohibiting defendants from engaging in the conduct further;
c) Award Plaintiffs compensatory and punitive damages, as determined at trial;
d) Award Plaintiffs attorney's fees and costs;
e) Award such other and additional relief that this Honorable Court deems just.

## COUNT II
### (42 U.S.C. § 1983 – First Amendment Violation)

54. Plaintiffs re-allege paragraphs 1 through 49 as if fully set forth herein.

55. Plaintiffs' actions in publicly speaking out against Defendants' mishandling of their regulatory duties, as described above, are expressions of free speech protected by the First Amendment to the United States Constitution, and applied to the States through the Fourteenth Amendment.

56. Defendants' conduct of interfering with lawful First Amendment speech by retaliating against Plaintiffs and targeting them for unlawful Code violations and enforcement proceedings violated Plaintiffs' First Amendment rights.

57. Defendants' conduct caused Plaintiffs to be fearful of speaking out further and chilled their First Amendment Rights and caused damages.

WHEREFORE, Plaintiffs ask that this Honorable Court:

a) Enter judgment against the individual Defendants;
b) grant Plaintiffs a declaration that the conduct of Defendants is in violation of their constitutional rights and enter a preliminary and then permanent injunction prohibiting defendants from engaging in the conduct further;
c) Award Plaintiffs compensatory and punitive damages, as determined at trial;
d) Award Plaintiffs attorney's fees and costs;
e) Award such other and additional relief that this Honorable Court deems just.

## COUNT III
### (42 U.S.C. § 1983 – Civil Conspiracy)

58. Plaintiff re-alleges paragraphs 1 through 49 as if fully set forth herein.

59. Defendants acted in concert pursuant to an agreement to deprive Plaintiffs of their constitutional rights.

60. Defendants knowingly and intentionally schemed and worked together in a common plan to harm the Plaintiffs.

61. As described above, Plaintiffs suffered harm as a result of the Defendants' conspiracy to violate Plaintiff's constitutional rights.

WHEREFORE, Plaintiff asks that this Honorable Court:

a) Enter judgment against the individual Defendants;
b) grant Plaintiffs a declaration that the conduct of Defendants is in violation of their constitutional rights and enter a preliminary and then permanent injunction prohibiting defendants from engaging in the conduct further;
c) Award Plaintiffs compensatory and punitive damages, as determined at trial;
d) Award Plaintiffs attorney's fees and costs;
e) Award such other and additional relief that this Honorable Court deems just.

**Plaintiffs demand a trial by jury on all claims.**

Respectfully submitted,

/s/ Sara A. Garber
*Counsel for Plaintiff*

Sara A. Garber
Tony Thedford
Thedford Garber Law
53 West Jackson Blvd., Suite 638
Chicago, Illinois 60604
O: 312-614-0866
E: sara@thedfordgarberlaw.com
F: 312-754-8096